UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

ANTHOINE DESHAW ODOM,

Plaintiff,

v.

DANIEL HINES, et al.,

Defendants.

Case No. 2:12-cv-374

Honorable Robert Holmes Bell

______________________________________/

**OPINION**

Plaintiff Anthoine Deshaw Odom, an inmate currently confined at the Baraga Maximum Correctional Facility (AMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against numerous employees of the Michigan Department of Corrections (MDOC). On November 27, 2013, the court dismissed Plaintiff's claims against Defendants Sheri, McKeon, Gilbert, Govern, Lindberg, Atkins, Curley, Wealton, Coello, Rule, Petaja, Dewar, Bush, Pesola, Lapoint, Tribley, Place, Perrish, Miller, Haischer, Gill, Yankavitch, Snider, LaChance, Comfort, Zachy, Mackey, Reckor, Frackin, Perry (the short one), Mayo, Dr. Fracki, Sackett, Berry, Ross, Lake, McPhearson, Betts, United States District Judge R. Allan Edgar, Morgan, Lau, Antalia, Perry (the tall one), Latundresse, Amlie, CMS [Corrections Medical Services], Woelek, Harris, Bursard, Masker, Attorney Peters, Attorney Peleta, Young, Zimbleman, Taja, Ceollo, Napel, Michigan Parole Board Commission, Heyns, Beauchamp, Cummings, Wallace, Alexander, Caron, Nardie, Talieo, Niemeisto, Yunker, James, Vietalla, Havenor, Sibily, Larson, Steal, Chaplain Peters, Mohrman, Burns, Nelson, Eagen, Warchock, Kutichie, Grant, Henshaw, McIntire, Verntenes, and Reddinger. However, the

Court served Plaintiff's complaint with regard to Plaintiff's retaliation claims against Defendants Hill, Stecarol, Mills, Joki, Jhondreau, Hutchinson, Minnard, Turner, Himmila, Negalie, Goodreau, Grubb, Hommer, Tehakko, Beasly, Shainer, Kutchie, and Toleftson, as well as his Eighth Amendment claims against Defendants Hutchinson, Minnard, Turner, Himmila, Toleftson, Wellman, Bolton, Hill, and Kutchie.

In summarizing Plaintiff's allegations, the court noted:

> On October 23, 2013, Plaintiff filed a second amended complaint, in which he alleges that on February 3, 2012, he was transferred from MBP to the Baraga Maximum Correctional Facility (AMF). Plaintiff states that Defendant Tribley and other members of the Security Classification Committee (SCC) were responsible for his transfer. When Plaintiff spoke to Defendant Jhondreau about the transfer, Defendant Jhondreau stated that Plaintiff had beaten up staff in Jackson, then he had come "up north" and filed grievances and complaints. Consequently, Plaintiff was never going to get out of segregation.
>
> Plaintiff states that he was initially sent to MBP by Defendants Gilbert, Sheri, and McKeon to have a "fresh start" because of the retaliation he was experiencing as the result of a lawsuit he had filed against 43 prison officials at AMF. Plaintiff claims that he had been doing well at MBP until he "crossed paths" with Defendant Nelson, who had previously worked at AMF. Plaintiff states that AMF staff subsequently took over MBP and Plaintiff began to receive retaliatory misconduct tickets. Defendant Govern tried to get Plaintiff to amend a lawsuit he had filed, stating that he knew all about Plaintiff and that he had nothing coming. Plaintiff was placed in D Block at MBP and ceased getting misconduct tickets for a period of time, during which staff on the unit told Plaintiff that they did not have any problem with him.
>
> Plaintiff states that during this time period, he had a legal writer working on a petition to the United States Supreme Court. Plaintiff claims that at one point, the legal writer sent Plaintiff a letter requesting specific documents. Plaintiff states that he had never mentioned these documents to the legal writer. Plaintiff believes that prison officials were using the legal writer to discover the specific facts of Plaintiff's action. Plaintiff states that he had already contacted Michigan State Representative Steve W. Lindberg concerning the retaliatory conduct of staff at MBP, including the staff who had recently arrived from AMF. Lindberg contacted Legislative Ombudsman Field Officer Tane Atkins, who wrote saying that they would be reopening the investigation, but that it was going to take awhile. Subsequently, Plaintiff was approached by a guard that he recognized as having come from AMF, who told Plaintiff that he was being transferred out. When the property officer came to Plaintiff's cell, Plaintiff was told that he was being sent to AMF. Plaintiff protested

that he had been transferred out of AMF because of the problems he was having with staff.

Plaintiff states that once he was back at AMF, he was surrounded by numerous people that he had previously sued. Plaintiff was bombarded with major misconduct tickets from staff. Plaintiff states that Defendant Tehakko blocked the camera while Defendants Stecarol and Beasly claimed that Plaintiff had grabbed four fingers of their hands. Plaintiff received a sexual misconduct and an assault and battery, and was placed on upper slot restriction. Plaintiff was subsequently set up again by Defendant Tehakko and was placed on shower restriction. Plaintiff states that when his mother called Defendants Sheri and Gilbert, she was told that Plaintiff had been transferred back to AMF because an inmate needed to be transferred in to MBP in order to receive mental health services. Plaintiff contends that there were other inmates at MBP who could have been transferred other than himself.

Plaintiff claims that on February 23, 2012, he gave Defendant Jhondreau a grievance with attachments, but that Defendant Jhondreau never turned in the grievance. Plaintiff alleges that Defendant Mills got Defendant Beasly to refuse to bring Plaintiff his snack bag and got Defendant Joki to write a false misconduct ticket on Plaintiff. On February 24, 2012, Plaintiff showed Defendant Mills his ingrown toenail, and she reacted with horror. Defendant Mills then told Plaintiff that she would get back at him for filing a lawsuit against her and walked away without giving Plaintiff his medicine. Plaintiff believes that Defendant Minnard convinced Defendant Hutchinson to discontinue Plaintiff's medications because of the lawsuit. In addition, Defendant Snider told Plaintiff that nurses on second shift did not have to pick up medical kites. Also on February 24, 2012, Plaintiff submitted a store list ordering seventeen stamped envelopes, toothpaste, greeting cards, and other items. However, Plaintiff only received one stamped envelope. Plaintiff showed Defendant Beasly his store receipt and was told that medical had taken Plaintiff's money when he first arrived because Plaintiff had asked for something for his cold. Plaintiff asserts that he never received anything for his cold. Plaintiff made an appointment with Defendant Comfort, but by the time of his appointment two weeks later, he was no longer ill. On February 25, 2012, a nurse named Jeff told Plaintiff that he would be required to pay for his medical call outs, despite the fact that medical personnel were being paid by the MDOC. In addition, Plaintiff complains that Nurse Jeff revealed his medical information in front of other prisoners, which resulted in embarrassment to Plaintiff.

On March 11, 2012, Plaintiff gave a medical kite to Defendant Mills, after she walked by Plaintiff's window without giving him his medication. On March 18, 2012, Resident Unit Officer Martie came and set Plaintiff's pills on top of the food slot as if he was Defendant Mills, then he and Defendant Mills ran off laughing. Plaintiff states that the Resident Unit Officers have shown the nursing staff how to use the wing camera to make it appear as if they are offering Plaintiff his medications, because there is no audio recording.

On July 20, 2012, Defendants Toleftson, Turner, Himmila, MacIntire, and Kutchie were responsible for placing "flys" [sic] and "rocks" in Plaintiff's food items. Plaintiff was not given a replacement tray. Plaintiff claims that while confined at AMF, the heat was not turned on until November 1st, so that the cells were uncomfortably cold. Plaintiff also states that Defendant Himmila slammed the security cart up against his cell, violating policy regarding noise levels in the unit. Plaintiff also claims that while on unit 3 at AMF, he was housed between two psychotic prison informants, and that Defendants Tehakko and Beasly paid them by giving them extra food loaf. Plaintiff claims that Defendants Tehakko and Beasly bumped into him while passing him and then claimed that Plaintiff had assaulted them. In this manner, Defendants Tehakko and Beasly set Plaintiff up on misconducts in order to prevent Plaintiff from being released into the general population. Therefore, Plaintiff stopped going to the shower and the yard in order to avoid any contact with them.

Plaintiff claims that he suffers from numerous psychiatric disorders, such as obsessive compulsive disorder, bipolar disorder, suicidal tendencies, dysthmia, borderline personality traits with narcissistic features, antisocial personality disorder, and schizo affective disorder. Plaintiff states that Defendant Woelek refused to treat him at AMF. In addition, Plaintiff states that the psychiatrist at MBP told him that he was not going to treat Plaintiff at the present time.

Plaintiff claims that Defendant Wellman, a registered dietician, discontinued his medically prescribed snack bags, stating that Plaintiff had been placed on a "minnus" [sic] diet. Plaintiff claims that Defendant Attorneys Peters and Peleta breached a contract with Plaintiff by failing to ensure that his pleadings were filed with the "Jackson Court" before his deadline was up. Plaintiff claims that he was improperly found guilty of assault by Defendant Young, and that he never received his findings from Young's supervisor so that he could file an appeal of the misconduct.

Plaintiff alleges that Defendant Hutchinson improperly discontinued medication to treat Plaintiff's terminal condition, at the behest of Defendant Minnard. Plaintiff claims that the discontinuation of his medication caused him to suffer excruciating headaches. Defendant Minnard also allowed a Corrections Officer to reveal Plaintiff's medical condition in front of other prisoners. Plaintiff claims that Defendants Turner, Negalie, MacIntire, Goodreau, Himmila, Lapoint, Grubb, Hommer, and Reddinger told him that they did not care about his grievances or lawsuits, telling Plaintiff that his last lawsuit did not get him very far. Plaintiff contends that Defendant Lachance falsely claimed that Plaintiff had refused to go to his annual dental cleaning appointment, depriving Plaintiff of dental care. Plaintiff

alleges that while in segregation at AMF, his weight dropped from 210 pounds to 158 pounds and that he became delirious and talked to himself.[1]

On January 19, 2013, Plaintiff was transferred back to MBP and was placed on a cell block reserved for mentally ill prisoners. Plaintiff had been ticket free for approximately 8 months and was on stage 5 of the incentive program. Plaintiff states that he has a RPA [Regional Prison Administrator] hold and that inmates must be ticket free for one year in order to be released from such a hold. Plaintiff states that Defendant Hill, who was a defendant in Plaintiff's previous lawsuit, told him that he needed to straighten his cell, even though it was already neat. Plaintiff states that he showed both Sergeant Hennings and the Assistant Resident Unit Supervisor his cell, and they stated that it was neat and in order. Defendant Hill subsequently told Plaintiff that he was "f$#ked," because he wanted to file lawsuits and that he should not "cry about not moving" to a higher stage in the incentive program. Defendant Hill also told Plaintiff that he was responsible for Plaintiff's transfer back to MBP. Plaintiff complained about Defendant Hill's conduct to Defendant Talieo, who stated that Plaintiff was not going to be transferred to another unit and would have to work things out with Defendant Hill.

On January 28, 2013, psychologist M. Salmi wrote a ticket on Plaintiff for being nude with an erect penis. On January 30, 2013, Plaintiff complained to Defendant Talieo about the sexual misconduct ticket. Defendant Talieo stated that he did not care and that Plaintiff had been sent back to AMF as punishment for filing lawsuits. On January 31, 2013, Plaintiff went before the Security Classification Committee (SCC) and confronted the Captain and Inspector with his claims of a conspiracy to give him misconduct tickets in order to keep him in segregation, to no avail.

Plaintiff asserts that Defendant Govern improperly denied him legal copies on two occasions in 2011, and that his access to the courts was "delayed" by this conduct. On another occasion, Defendant Govern told Plaintiff that mail to the Legislative Correction Ombudsman's office does not qualify as legal mail. Plaintiff asserts that on another occasion in 2011, Defendant Hill refused to go through the chain of command, and told Plaintiff that his complaints should be reported to a supervisor. Plaintiff also claims that on February 4, 2013, staff told him that he did not have

[1]According to the biographical information for Plaintiff on the MDOC's Offender Tracking System, he is 5 feet and 7 inches tall. Based on this information, it appears that Plaintiff's asserted weight loss was likely beneficial to his health. Moreover, as of September 23, 2010, Plaintiff weighed 175 pounds. Therefore, considering the fact that Plaintiff was not transferred to AMF from MBP until February 3, 2012, his claim that he went from 210 pounds to 158 pounds while in segregation at AMF appears to be suspect. At the very least, Plaintiff would have had to gain 35 pounds in less than a year and half prior to his transfer to AMF. *See* http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber =228931.

anything coming from the store, so that Defendant Nardie, who had taken Plaintiff's store order, must have failed to submit the order on Plaintiff's behalf. Plaintiff states that his mother had put money on his phone card, but that when he attempted to use the card he was told that there was no money on it.

Plaintiff claims that the false misconduct tickets he has received have caused him to be denied parole. Plaintiff states that he is constantly worried about dying, and is not receiving appropriate treatment for his depression. Plaintiff alleges that he has been seen by numerous psychiatric professionals, but that they are unwilling to let him talk openly about his concerns. On March 10, 2013, Plaintiff spoke to Defendant Shainer regarding a kite he submitted on March 7, 2013, regarding the fact that Plaintiff had become sick after eating oatmeal with some "film" on top of it. Defendant Shainer responded by swearing at Plaintiff and telling him that he was going to suffer because he had sued Defendant Shainer's friends.

Plaintiff claims that Sergeant Hennings reviewed him on misconduct tickets, and took the side of staff despite knowing that the misconduct tickets were false. On March 12, 2013, Defendant Hill told Plaintiff that if he did not expose himself and masturbate, he would not receive his breakfast tray. On March 15, 2013, Plaintiff received a sexual misconduct ticket from Psychologist Salmi, asserting that Plaintiff had exposed himself, when in fact Plaintiff was in the bathroom area and was not aware that he was being observed. On September 23, 2013, Defendant Nardie told Plaintiff that he would be transferred to I-Max, but Plaintiff's roommate was transferred instead. Plaintiff claims that Defendants did not interview him on grievances and that Defendant Napel failed to properly supervise his subordinates. Plaintiff states that he has been harassed and discriminated against in order to prevent him from advancing through the incentive program throughout his incarceration at AMF and MBP.

On August 30, 2013, Plaintiff placed a store order when an unknown officer told Plaintiff that neither he nor officer Jennings would give Plaintiff anything. Plaintiff complains that the fan is left on in the segregation unit during the night, causing Plaintiff and other inmates to suffer from the cold temperatures. Plaintiff complained to Defendant Niemisto about being harassed by staff and being kept in administrative segregation longer than necessary, to no avail. Plaintiff claims that he requested a hearing packet from the Hearing Investigator, so that he could challenge his major misconduct, but he never received the packet.

Plaintiff claims that Defendant Bolton assaulted him by using Plaintiff's belly chains to pull his feet out from under him, causing Plaintiff to fall and hit his head on the floor. Defendant Bolton then yelled at Plaintiff to stay down and acted as if Plaintiff was resisting and had caused the incident. Plaintiff subsequently received a misconduct ticket regarding this incident. Plaintiff states that he suffers from migraine headaches as a result of the trauma to his head.

Plaintiff claims that on September 26, 2013, while he was at health services, Defendants Nelson and Hill went into his cell and removed an original complaint that was filed with the court. Plaintiff stopped Defendant Napel when he was making rounds and told him about all the problems he had been having with former AMF staff since he had been transferred back to MBP, including the false misconduct tickets he had received. Plaintiff claims that staff are using the misconduct tickets to keep Plaintiff in administrative segregation, and that the real reason they want to keep Plaintiff out of the general population is his HIV and HCV status. Plaintiff asserts that this constitutes discrimination and is illegal. Plaintiff states that this also allows staff to prevent Plaintiff from obtaining a job as a porter.

On October 7, 2013, Plaintiff was told that he was at Stage 4 of the Incentive Program. At this stage, Plaintiff should have been allowed to have a television or radio, to order candy and chips, and to use the telephone to call family and friends. However, when Plaintiff attempted to use the telephone he was told that he did not have a valid PIN number. Once that was resolved, Plaintiff was told that he did not have money in his account to pay for the call, even though Plaintiff's family had just put money in the account. In addition, staff claimed that Plaintiff had destroyed his television in 2011, so that Plaintiff was not allowed to obtain a new television.

Plaintiff alleges that on August 20, 2013, he gave Defendant Nardie a regular disbursement to send mail to his mother's home via certified mail. Plaintiff received a receipt on September 19, 2013, but never received the green card indicating that the mail had been received by his mother. Plaintiff states that the money was deducted from his account to pay for this service, but he still has not received the green card. On October 13, 2013, Plaintiff asked Defendant Vietalla about the green card, to no avail.

On October 11, 2013, Plaintiff asked Defendant Kutchie why he was ignoring Plaintiff and why he had influenced medical staff to also ignore Plaintiff. Plaintiff states that Defendant Kutchie harassed Plaintiff by trying to get into verbal disputes with Plaintiff over word definitions, revealing Plaintiff's medical information to others on second shift, and belittling Plaintiff over his "sexual organs" and behavior. Plaintiff states that Defendant Kutchie is motivated by the fact that Plaintiff is suing Defendant Kutchie's brother at AMF. Plaintiff complained to Sergeant Barnette, but he refused to take any corrective action.

Plaintiff claims that there is too much fraternization between medical staff and security staff and that security staff influences medical personnel to give them information about Plaintiff or to cover up the misconduct of security staff. Plaintiff claims that Defendants have violated his rights under the First, Eighth and Fourteenth Amendments. Plaintiff seeks damages and equitable relief.

*See* docket #53.

Presently before the Court are the Motions for Summary Judgment filed by Defendants Bolton, Hill, Wellman, Grubb, Himmila, Jhondreau, Mills, Negalie, Tehakko, Toleftson, Turner, Henshaw, Stecarol, and Kutchie pursuant to Fed. R. Civ. P. 56. *See* Docket ##130, 134, 140, and 155. The time for filing responses has passed and the matter is ready for decision.

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-216 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party

has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Defendants Bolton, Hill, Wellman, Grubb, Himmila, Jhondreau, Mills, Negalie, Tehakko, Toleftson, Turner, Henshaw, Stecarol, and Kutchie claim that they are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies. Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in

accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ X.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ GG. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response

was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ X. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id* at ¶ HH.

Defendants at MBP, specifically Defendants Wellman, Bolton, and Hill, assert that while confined at MBP, Plaintiff filed twelve grievances. Of those, eleven were rejected at step III because his appeal at that level was untimely. A review of Plaintiff's Step III grievance responses supports this assertion. *See* docket #131-3, pp. 4-7, 25, 28, 31, 34, 37, 42, 48, 52, 55, 58, and 63 of 65. The only grievance that Plaintiff properly appealed to step III was grievance MBP-11-05-1386-14z. *Id*. at p. 21 of 65. A review of the grievance record shows that Plaintiff fails to name Defendants Wellman, Bolton, and Hill in his step I grievance. *Id*. at p. 23 of 65. As noted above, MDOC policy requires Plaintiff to specify dates, times, places and names of all those involved in his step I grievance. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19. Therefore, Defendants Wellman, Bolton, and Hill are entitled to summary judgment for failure to exhaust administrative remedies.

Defendants Tehako, Jondreau, Turner, Hemmila, Nagele, Tollefson, Greub, and Mills state that since 2010, Plaintiff has filed twenty-one step III grievance appeals while confined at AMF. However, the allegations at issue in the instant case occurred after Plaintiff's transfer to AMF from MBP on February 3, 2012. A review of Plaintiff's grievance record shows that he filed seven step I grievances at AMF during this time period. Of these grievances, only two, AMF-12-05-1502-12b3

and AMF-12-05-1501-12f3, were filed at step III prior to the date that Plaintiff instituted this lawsuit. *See* docket #135-3, pp. 2-20 of 56. A plaintiff must pursue all levels of the administrative procedure before filing an action in federal court. *See Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). Therefore, because Plaintiff did not allow the administrative process to be completed on the other five grievances prior to filing his complaint, the court may not consider the issues raised in those five grievances in determining whether Plaintiff exhausted his administrative remedies.

In grievance AMF-12-05-1502-12b3, Plaintiff named Psychologist Woelek[2] and complained that he was being denied needed mental health treatment for his depression. Plaintiff failed to name any other individuals in this step I grievance. *See* docket #135-3, p. 41 of 56. In grievance AMF-12-05-1501-12f3, Plaintiff named Doctors Huethhse and Crane and complained that two of his medications, Kaletra and Truvada, were causing him to suffer from erectile dysfunction. Plaintiff failed to name any of the remaining Defendants in this step I grievance. *Id.* at p. 46 of 56. As noted above, MDOC policy requires Plaintiff to specify dates, times, places and names of all those involved in his step I grievance. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19. Therefore, Defendants Grubb, Himmala, Jhondreau, Mills, Negalie, Tehakko, Toleftson, Turner, Henshaw, Stecarol, and Kutchie are entitled to summary judgment for failure to exhaust administrative remedies.

In light of the foregoing, the court concludes that Plaintiff has failed to sustain his burden of proof in response to the motions for summary judgment filed by Defendants Bolton, Hill, Wellman, Grubb, Himmala, Jhondreau, Mills, Negalie, Tehakko, Toleftson, Turner, Henshaw,

---

[2]Plaintiff's claims against Defendant Woelek were dismissed for failure to state a claim on November 27, 2013. *See* docket ##53 and 54.

Stecarol, and Kutchie. Accordingly, Defendants' Motions for Summary Judgment (docket ##130, 134, 140, and 155) are GRANTED. In addition, the court notes that the remaining individuals named by Plaintiff in this case, Unknown Beasly, Unknown Joki, Unknown Hutchinson, Unknown Minnard, Unknown Goodreau, Unknown Hommer, and Unknown Shainer, are also entitled to dismissal for failure to exhaust administrative remedies because the record shows that Plaintiff has not named these individuals in the pertinent grievances. Therefore, this case is DISMISSED in its entirety.

The court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the court grants Defendants' motions for summary judgment, the court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the court will assess the $505 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If Plaintiff is barred, he will be required to pay the $505 appellate filing fee in one lump sum.]

A Judgment consistent with this Opinion will be entered.

Dated: February 18, 2015

/s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE